Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now open. The Honorable Susan F. Hutchinson is our witness. Please be seated. Your Honors, the first case we've done this morning is the F-43 and F-0273, during the marriage of Appellant Micheli, Sister Appellate, and John Micheli, Respondent Appellate. Arguing on behalf of the Appellant, Mr. David R. Delray. Arguing on behalf of the Appellate, Mr. Michael A. Weiner. Good morning, everyone. And, Mr. Delray, if you're ready, you may proceed. I'm sure I'm ready. Your Honor, David Delray on behalf of Alan Micheli, who's present, the Appellant. Your Honors, as I stand before you this morning, Alan Micheli has never had a legitimate general review of her maintenance, which is allowed through her MSA. Alan sacrificed her own career. She moved across the state as a young wife, left her job at Allstate, while her husband continued a linear ascent. While she stayed at home, sacrificed for her two children, well over 21 years of marriage. For that, she received seven years of maintenance. Now, Justice Hutchinson, you wrote in Bernay, and by the way, in Bernay, that was a 16 1⁄2 year marriage. Ms. Bernay is now on her 29th year of maintenance. Now, I know there's some distinguishable facts. But I just want to make it clear to this Court, regardless of talking about whether or not discovery should have been open or not, the facts of this case, had there been an actual general review that took place, dictate an extension and a review of the maintenance. Okay. Mr. Delray, what would the purpose of that particular reopening and discovery process be in light of the, I guess, the cap that was placed on, I think it was, I can't remember the number. 312, that's correct. Right. But I can't remember the number of the Michelle case because I think we're on our fifth appeal. That's correct. So it's one of the previous. So what would be the purpose of that since we have that cap set? So if the point that the trial court made was discovery relative to income and assets is not relevant because of a cap, that's not what the statute says. Even if there's a cap, you're entitled by the statute, 504 and 510, to know everything about the payor's total household income and assets. We know something about it just from his own testimony. He did testify, and I think at one point he said he can pay whatever's ordered. Right. And so what's, again, not that I'm suggesting that the trial court should say, okay, you're up for a million dollars a month, go for it, because you said you'll pay whatever's ordered. But if he's offering that particular position, what is discovery going to accomplish? Well, first of all, if there was actually a legitimate stipulation, which there wasn't in this case, there was no oral, no written, and even if there is a stipulation by law, case law, you're allowed to still inquire relative to assets. You're allowed to inquire as to the stipulated subject matter. That didn't happen. That's true, but these people aren't married anymore, and they haven't been married for some time. So things that he has acquired subsequently, and we know his salary's increased. His base salary is now 320, as opposed to 200,000 in 2012. And so, you know, we have, we're at that cap. I mean, are you asking that the cap change? Are you asking for additional information because you want a higher number? I'm just not sure what you want from that, especially since they've been divorced for 11 years, 12 years. He can get what he can get. She can acquire what she can acquire. This is not about property. This is about paying additional money. No, it's not about property, but certainly under 504 and 510, you look at the assets and the property of both parties as they sit during the review. But you also go back to the standard of living at the time of the dissolution in 2012. I agree. It has nothing to do with the standard of living now that he may be living. I agree, but it's still a factor. Then again, what are we looking for? Well, listen, Justice, what I'm saying is there was just a termination. Under the 2020 ruling, which was a rehabilitative review, an incorrect one, I submit, and this Court has already said it was, our position is that the trial court did the same thing in 2023. No new evidence, no testimony, no exhibits, no discovery, which I can talk about in a moment, an order, a ruling based on a directive to the lawyers which said, tell me what the mandate means. That's what we were told we were supposed to put in writing for the trial court. And instead, three months later, we got an order that allegedly put, you know, square pegs and round holes and just kind of fit what the trial court thought was your mandate, which was doing general review. I submit you gave a very, it was a general mandate, but you gave specific. Look at these factors that we don't think you considered. The factors that he didn't consider that you said in your opinion, in Michelli 4, all dealt with child's income and assets. You said trial judge, you ignore all of them. And then you finally said additionally it is unclear whether the trial court considered the duration of the maintenance payments previously paid relative to the length of the marriage. Did you see that in the order that was written? Again, denying? Again, he didn't have to deny it. He could have reduced the maintenance. He could have said, you know what, there has been a period where Ms. Michelli has earned more income. She's worked hard at age 56, 70 hours a week to earn $74,000 a year. I'm going to reduce the maintenance, perhaps from the $3,700. Perhaps he's going to say I'm not going to go all the way to the cap. There's a lot of different options and discretion the court has without just denying seven years on a 21-plus year marriage. Okay, but that's true. I agree with you. But what help would discovery have been to prevent what occurred? Well, let me say this. One example is 510 and 504 says you look at the estate of both parties during the review. Mr. Michelli is now remarried. He has a wife. We know nothing about her income or assets. But there's no question that he has the ability to pay maintenance, regardless of whether that figure remains the same. He has the ability, even if it goes up or it goes down, correct? I believe so. I mean, that's what all indications are, and that's the position he took in the trial court, correct? Yes. So why do more discovery? Shouldn't the issue really be whether or not discovery should be extended until Ellen's retirement? Maintenance. I think you meant maintenance. No, I understood your question. I would say this, Judge. Even without the further discovery, we believe, based on Ellen's needs that she testified to, it was still an extension of maintenance case, based on her health that was glossed over. Two tumors in her brain, missing time from work because of her health, sleeplessness, headaches, et cetera. All of these factors point to me to say that maintenance should have been extended. He has the ability to pay, as it sounds like you all agree that he does. Well, he said he did. I can't tell him he doesn't. He said he did under oath. Agreed. That's a fact. She was still not meeting her needs on a monthly basis, to the tune of $1,100 a month, through her combined efforts of her own income, which had increased, no question about it, nobody's denying that. And the maintenance that she was receiving. She was still running a deficit. She was cashing in assets to pay the tax on the maintenance. That's not fair. That's not what maintenance is for. She wasn't rehabilitated. It wasn't a rehabilitative review. It was a general review. Well, where in this decree is this supposed to be rehabilitative maintenance? It's not. Nowhere. It is absolutely not. All right. So it's just maintenance pursuant to the original intent of the decree.  There's no burden in the MSA on Ellen Michelli whatsoever. The burden was improperly shifted to her. And I submit, in the second order as well, in the second order as well, it seemed and read like she's rehabilitated. How many judges have been involved in this case, Mr. Del Rey? I can name a few. Judge Brodsky, Judge Johnson, Judge Collins. Okay. And under, you mentioned Bernay, under Bernay, although this record is extensive, they should, each of those judges should have looked back to the original intent of the decree. And somehow that hasn't happened, has it? Well, I would say this Court has already said that the law of the case in this is that it's not permanent maintenance case. We're not arguing for that. You have already said that. And so, yeah, I pay that a lot of respect. We're asking, we were asking for a review which would have been X amount of years plus another review because I don't think the case law supports that a judge can just do three and out with a termination date based on this district, second district. And do you agree that she is not just entitled to what the current or what the 20, what would that be, 18 maintenance schedule would be because that may be available as a help but she's not entitled to whatever that amount might be simply because this divorce occurred before that modification of the statute? No. I mean, I agree with you that the guideline is going to apply for a lot of reasons, one of which is that Mr. Bernays' income is well beyond the guideline. And I'm not asking to apply the new, this is the old form. It's based on gross. She has to pay the taxes on it. And so when you net that down on a monthly basis from her unrebutted testimony and her financial affidavit and all of her discovery, she's still running at a deficit, not nearly as well, not even close to the standard of living that she was accustomed to at the time of the dissolution despite all of her efforts. Look, she wasn't a malingerer. She wasn't one sitting around, well, listen, I get all this maintenance, a gap up to 320. I'm going to sit back and do nothing. That's not Ellen Michelli. The decree recites that they had a conservative, I think the word is lifestyle. What exactly did that mean? Well, I think that's all relative, but I would say that they lived in the north suburbs of Libertyville. The kids went to great schools. They played sports. They lived a nice lifestyle. They traveled. They vacationed. And the lifestyle that my client has now is a condominium in Chicago. I think she's still in the same vehicle as she has in 2012. She has only touched her retirement when she's needed to and only dipped into assets when she's needed to and went out and worked. And at 56 years old at the time of this hearing was working between 55 and 70 hours a week. All right. The trial judge here talked about income in his final decision, that her income today is comparable to what her income would have been at the time of the divorce. And he was looking at about a million dollars, $1,100,000 total assets at the time of the divorce. And she has something in the vicinity, according to his addition, of $550,000 in assets today. But which one of those assets can she use? Or which one can't she use because of retirement penalties or other penalties that could be imposed?  First of all, I'll say that this baseline that the trial court figured out on its own was a fiction. There was no evidence in the record at all about what they actually had at the time in assets that she received. They used percentages in the MSA. There was a merit of balance sheet that counsel for appellee used during the closing argument, but that was not any sort of evidence of actually what she had. And as you know, they've litigated the issues of options and the maintenance. But to your point— It got attached to something, didn't it? I'm sorry? That marital sheet, that marital asset sheet got attached. Yeah, to the closing argument, Mr. Michelli. So it was just argument, respectfully. I would say this, though, Your Honor. They both have—their assets have increased, but my client is not of an age where she can tap into any sort of retirement. She can't tap into any pension, marital pension of Mr. Michelli from Allstate either at this point. So what that was in 2019 was really just kind of a bridge. If it was three years in a review or four years in a review, once that pension kicks in, where she gets half, and it is in the record, it's going to be about $6,000 a month, she might not need the maintenance, honestly. We're not there yet. We certainly weren't there in 2019 and 2020. You can—right now I don't have any other questions that I need to ask. In your request for relief, in your conclusion, you asked for a remand for further proceedings. Correct. What if we—if we decided that we're going to grant relief, we can issue an order that the trial court could have ordered, what would your request be? My request would be that if—well, remand for further proceedings as to how long her maintenance extension should be. That's what we would ask for. We know it's not permanent, but I submit to you respectfully it's not seven years either. That's just unequitable. It's not fair. It's unconscionable, in my opinion. Your position, it seems that at a minimum it should be until she's eligible for retirement. We're very close there, too. Yes. Yes. And what amount, to add to Justice Burkett's question, what amount would you be looking at if it was remanded? Would it be based upon what you believe to be appropriate from discovery, or did you have a number based upon the needs that she exhibited in 2019? Yes. To your point, great question. At 320 at the cap and 74 that she was making, it is still a maintenance case. Now, that number might be less than the 3,700. I'm not positive. I haven't run that number. It could be, but it's still a maintenance case at 320 and 74. And I think that, now, what prior counsel did, I was not counsel at the time of that particular hearing, essentially took the cap, took her income, and I believe that number was 4,400, so it's slightly increased per month. Well, during the course of this run of the seven years, it hasn't always been 3,700. There have been times when the bonuses kicked in from the $200,000 base to the cap. Absolutely, yes. I mean, we don't have a specific list of that, I don't think, in the evidence, but it could be it might have gone up to even over 4,500 a month based upon bonuses. It could have. I don't have those numbers memorized, but I will say this, from my memory, he has reached the cap for many, many years now, been over the cap. Thank you very much. Hold on just a second. Sure. Justice Kennedy and Justice Burkett, anything else? No.  You'll have an opportunity to respond if you choose to. All right. Counsel. Good morning. May it please the Court, Michael Weinman on behalf of the appellee. When the last appellate ruling was issued in this case, having been the lawyer of Mr. Michelli since 2009, when Mr. Michelli filed these proceedings, it was abundantly clear to me that this animal court did not feel as if, when Judge Collins delivered his ruling in November of 2020, denying this an oral ruling with not specific findings, that it hadn't met the criteria that was required under 504 and 510 to complete the adjudication of Ms. Michelli's request for additional maintenance. This court has previously, on multiple occasions, found Ms. Michelli is not entitled to permanent maintenance and Ms. Michelli is not entitled to guideline maintenance, based upon the fact that the statute was changed after the parties were divorced. Well, they're not asking for either one of those. I appreciate that, but if someone asks, in practice, I believe, Your Honor, for maintenance until retirement, that is essentially asking for maintenance that's permanent because everyone acknowledges that, and I represented Ms. that, obviously, retirement is a substantial change in circumstances, which would warrant relief under Section 510. But in this matter, it's clear, under the last appellate ruling that was entered in this matter, that this matter was remanded because of two reasons. A, the proper legal standard had not been applied. This honorable court felt that the trial court had applied the wrong standard review and hadn't fully considered all the 504 and 510 factors. Okay, then let me ask this question. How is just adding up what she has on her balance sheet, her condo and whatever its equity is, the retirement accounts that she shouldn't be touching because of penalty, I think $11,000 in a bank account. There's an addition of all of those versus what Judge Collins thought was the what would be half of the assets at the divorce. How is that in any way considering what the real standard should be here or the real facts should be here? What was their standard of living at the time of the divorce? And that's all Judge Collins did. He added up these numbers and said, She's got enough. I don't think that's what he did. I believe what he did was he heard her testimony over a great period of time in January and August of 2020. And he also looked at all the financial records that were presented. Ms. Michelli has investments of more than half a million dollars, and the law of the case by earnings. Can she touch those today? She absolutely can. And is she required to exhaust them to pay all of her expenses today? Candidly, Your Honor, I don't believe she needs to exhaust any of them to live the standard of living that the parties led during the course of the marriage. Was she on vacation? I didn't note that. Multiple European vacations with her adult children. Okay. There is a common law record which is replete based upon prior findings that Judge Brodsky and Judge Johnson have previously entered that Ms. Michelli has a track record for inflating her expenses, that she has tried to extend what the standard of living was during the course of the parties' marriage to establish and justify higher living expenses, and she made no attempt to economize or moderate. Those were the findings of Judge Brodsky back in 2012. 2011, forgive me. Then Judge Johnson, when he heard the remand of this matter, found that Ms. Michelli was living a profligate lifestyle. The question that has been presented to you is give maintenance based on her needs. Needs is not the question here. Does she need maintenance that Judge Collins was faced with to live the standard of living which was established during the course of the marriage? And quite frankly, when we tried this case before Judge Brodsky, Ms. Michelli, per her final financial affidavit, was working as a part-time school aide. Today she's working in a corporate sales job. Her rehabilitation is completed. That was an uncontroverted fact. Stevenson High School looks like a corporate entity at this point in time. I would agree with that proposition, but they're not publicly traded. She now works for a publicly traded company from which she gets all kinds of derivative benefits. And Judge Collins clearly appreciated when he took this matter on remand that he had made some mistakes. He took to heart what this court had said to him when it brought it back on remand, and he went from giving an oral ruling to rendering a 12-page written decision, which clearly applied the proper legal standard and did the full analysis. And that dovetails with the question that Justice Burkett was acting about the discovery. You're right that there's no question about it. John's income has been more than the standard of living since we first came before this appellate court. There's never been a question. Mr. Michelli has the ability to pay. I can't understand the arguments that we were acting inappropriately at the very beginning of hearing of saying we're willing to enter into a stipulation. Mr. Michelli has the ability to pay. That's not a question. But they have the opportunity to do discovery. They did do discovery. They sent a subpoena to my client's employer. We provided a financial affidavit, and in accordance with the last order that was entered prior to the hearing commencing in November of 2019, we tendered my client's final pay stub. He made more than $630,000. They were allowed, counsel had unfettered right to take his deposition. She chose not to take his deposition, part of the selection council. She didn't issue him a 214 request because it was abundantly clear. We all knew his income wasn't an issue. And within paragraph 14 of Judge Collins' decision, in paragraph 15, he makes replete findings as to what my client's financial condition is and says when compared to the condition of the marital estate and the party's standard of living during the marriage, the record of trial confirms John's financial condition has improved substantially. What more do they need? What more discovery? What more proofs? What else are they going to say? His income's gone from $600,000 to $700,000? That's not the barometer as to whether Ms. Michelli is entitled to additional maintenance. Okay. This is one of the findings that the judge made, that Ellen's net worth in 2020, factoring in her residence, bank accounts, investment accounts, retirement accounts, and automobiles, was at least equivalent to the overall net worth of the marital assets prior to the entry of the dissolution judgment in 2012. Is that the proper standard to determine lifestyle of a party? No, I don't think it is. But I think that's what he used. No, I think it was him using that as part of his analysis under the 504 and 510 factors. Under both of those statutes, the court is to look at what is her true financial condition today. And for the court to make a finding of what it is, it is part of the analysis he was required to make. But I look at this as a very, very linear case on a point of review. Yes, Your Honor. Ellen takes the position that it's unreported that she was operating at a deficit of about $1,100 a month. Is that true? Not within the lens of to live, the standard of living led to a marriage. I don't doubt that Ms. Michelli is now electing to live that profligate lifestyle that Judge Johnson found a remand. She's electing to live a lifestyle superior to that which was liked by the parties during the course of the marriage. The woman was comfortable, you were looking for. Judge Blasey found they lived a comfortable, but they were prodigious savers. They had saved, they had invested in Allstate stock, they had put savings away, they had maxed out retirement. They lived a modest lifestyle throughout the course of their marriage. Their children went to public schools. Most of their vacations were based upon Mr. Michelli getting it as part of a business trip. Did they have to buy Allstate stock? I thought they were getting it as part of their salaries. I think they had options. Not only were they getting it, but they had a stock investment plan that they could do it. But there was Judge Brodsky, from the very beginning, found that Ms. Michelli was trying to embellish what the true standard of living is. And that happened as found by Judge Brodsky, by Judge Johnson, and found by Judge Collins. Each of those jurists followed this. Ms. Michelli's been consistent. Since she came before this court in the first appeal, she's believed she hasn't gotten enough. She believes that she's entitled to more. And this is the fourth appeal now in which she's saying, the court abused its discretion when awarding me maintenance. Or not giving me maintenance, or not giving me sufficient maintenance, or denying me maintenance. But when I said it was a linear case, and getting back to that, this court, the trial court, has been provided with information historically going back to the first appeal. That Ms. Michelli had earnings of less than $2,000 a month when the parties were going through the divorce proceedings. The record is not clear as to whether Judge Brodsky took into consideration, because it was pretty much dovetailed, her acquisition of full-time employment at the school. And at that time, she had to refinance the house. She stayed in the marital realm. She didn't have to refinance the house. The house was sold and sent into it. All right, well, she stayed in the marital residence for a while until it was sold. And it's still not real clear to me exactly how much money they got from the sale of that house. But I know it was to be divided, the net was to be divided about 50-50. It was divided 50-50, and I believe that the proceeds were between $300,000 and $400,000. And if you're asking the question of worth and marital estate value, there's no question that based upon the second appellate ruling in this matter, in which this court upheld Judge Johnson not employing the Hunt formula and finding that all unvested and vested options that my client had were marital property, that's the savings we're talking about. That's the over $500,000 or $600,000 that Ms. Michelli has right now in excess of retirement, in excess of the pensions she has from both the teacher's retirement system and from her time at Allstate, and in addition to all the retirement she's funding. How did she get into a teacher's retirement pension? Previously, when she was working at Stevenson High School as a result of being on staff, she got to be part of that state-funded retirement benefit. Did she ever get vested? She wasn't there that long. I believe the record's clear. There's a stipulation Ms. Michelli has three type of defined benefit retirements that she's going to receive. Part of my client's pension from Allstate, her pension, and then her TRS. But in analyzing Ms. Michelli, I want this court, if it will please, look at her actions at the end of 2019 of someone who's allegedly not meeting their needs. At that time, while we're engaged in litigation on the review of maintenance, you have Ms. Michelli making double payments on her mortgage. You have Ms. Michelli in the very last pay period of 2019 taking virtually all of her income and funding a 401k so she can max out for the year. That's not indicative of somebody who's not able to meet their needs. That's not indicative of somebody not able to live the standard of living that the parties had led during the course of the party's marriage. And there's no question Ms. Michelli... As opposed to taking major vacations, they took some, but it was comfortably, they invested. That's exactly what she was doing. She invested at the end of the year. And so why is that? Because she has the ability to invest. Because she didn't just, in a moderated fashion like people would do throughout the course of the year, take a small slice of their income. She clearly didn't need the cash flow at the end of the year. She had the ability to say, take all of my income per se. I think it was $40 or $50 and put it all in the retirement. Because that's where she stands on a financial basis. There's no question she has no debt other than the mortgage that she elected to take. That she's living in a more expensive by all means and nicer home than she was living when the parties were married. And she's been freed of all of her domestic responsibilities. It took a while for that to happen, though, after the divorce. It didn't just happen overnight. I understand it. And I recall that our appeal of the duration of seven years, saying that seems like a very, very long time to review someone's rehabilitation, was upheld because Ms. Michelli did have more than ample time. She's done it. If you look at her performance appraisal that we acquired through Discovery because we were doing Discovery in preparation for the 2020 hearing, I subpoenaed her employer. And there's no question about it. Ms. Michelli is excelling in the business world. Ms. Michelli is on an upward path. As Judge Collins had noted in the first ruling he made, she's a rising star. She has hit a career path, and it's commendable. And the arguments that are made is that she's somehow being punished for her rehabilitative efforts. She's being punished for making more money by not getting more maintenance. And that's not the public policy here. The public policy is that in awarding maintenance under 504, the court is supposed to take into consideration the limitations that Ms. Michelli was faced with based upon her domestic responsibilities, and we acknowledge it based upon many, many years ago putting my client's career first. But she's rebounded, and she's clearly rebounded successfully, and Judge Collins heard her testimony over two days. She heard my client's testimony. The trial court didn't limit any discovery. The trial court didn't limit any proofs. There's no need for additional proceedings, and there's no basis to find that there's been an abuse of discretion. I thank the court for its testimony. I do have one question. What was the court's findings considering the health implications on her ability to work? The court found that there was no evidence, and I would acknowledge this, that this was a case that was impacted by COVID. We started in person in January of 2020, and then the issue of Ms. Michelli's health came out, and I issued discovery in accordance with Supreme Court Rule 213 looking to get information from an independent expert witness, a treater. They didn't call a treater. They decided not to call a treater. There was no evidence at all entered into the record, and, in fact, the record reflects from when we started the hearing in January. I brought a motion to ruminate saying it would be an unfair surprise because there hasn't been any opinions disclosed or anything, and they said we're not going to call anybody. So there was no medical or evidence that was admitted. Justice Burkett? Thank you very much. Thank you. Mr. Delray, if you wish to reply, you may do so. Justice Kennedy, the evidence was unrebutted that she took a three-month leave of absence, and she's a layperson. She can testify to how her two brain tumors were affecting her ability to earn an income. That was the evidence. It was unrebutted. Post-decree, Judge Johnson awarded $17,500 in attorney's fees to litigate in the appellate court. Why? Because he found, post-decree, that she did not have the ability to pay her own fees. That was appealed by Mr. Michelli, and this court upheld that $17,500. So post-decree, there was a finding she didn't have the ability to pay her own attorney's fees. At this hearing in 2019, she said, I had to go into my savings to pay for my own attorney's fees. That was part of the, and again, there was no credibility determination that her financial affidavit wasn't accurate. That didn't occur. In terms of attorney's fees, and that would be an expense that she had, based upon bringing the action for additional or continued maintenance, why shouldn't she pay those from whatever assets she could, because it was her request to have additional maintenance, and obviously we couldn't agree. No, this was a prior appeal relative to stock options. I forget what the year was with Judge Johnson, but my point in mentioning that to you is Counsel made this argument that since the divorce she's lived this lavish lifestyle. What I'm saying is that there was a finding. In order to have Mr. Michelli pay her attorney's fees, Judge Johnson had to first find she didn't have the ability to pay, which clearly he found at that point, subsequent to the divorce. I want to tell you about the facts of her income at the time of the dissolution in 2012. She had just started working full-time at Stevenson. Prior to that, she was part-time. She was making $45,000 a year. Seven years later in 2019, at the time of this hearing, she's making $73,000. Like nothing to sneeze at, but I mean, is that something we're determining your maintenance? It's gone up $29,000 in seven years. To me, that's not equitable, and those are the facts. And Judge Collins talked about this, her net worth in 2020, her residence, her bank accounts, investment accounts, and automobiles, retirement accounts, was at least equivalent to the overall net worth of the marital estate prior to the entry of the dissolution. And we addressed this on page 31 in our appeal. They're baseless claims. He wrote that based on a closing argument, nothing in fact. There was no baseline in 2012. We literally say this trial court's finding is particularly confusing given there was no evidence offered at the hearing in 2020, none, establishing the net worth of the marital estate prior to the party's divorce. It didn't come up. So I'm hopeful you're not going to rely on that. What I will say is this. Yes, she has three retirement accounts that she might be able to access soon. Just by way of the record, you can tell in 2019 and 2020 she was 56. So had this court given her, say, three years in a review, the trial court, four years in a review, it would have gotten her past the 59 1⁄2, 59 1⁄2, not to Social Security, but to where she could start withdrawing some funds out of retirement without incurring a 10 percent penalty. But that didn't happen. What assets can she actually access today if she had to? So today, although I'm not quite sure how well in days. The savings account. Absolutely. She has savings and she has retirement accounts. Now, she doesn't have access to Mr. Michelli's pension yet. No, but I mean anything that doesn't require a penalty. She has a savings account. She's 60 years old. So I think at this point. She has two cars that are older. She's 60 now, and so I think there are some accounts now, not in 2019 and 2020, that she could tap into if she had to. Again, I don't think the case law supports the fact that someone has to go into assets to live. But to your point, I think there are some that she could access now without the 10 percent penalty. I mean, there's some evidence of a $100,000 account that does not appear to be retirement, doesn't appear to be, or she can't. Is it a savings account that she has? My recollection is that she has like a stock account that she would have to pay ordinary income tax on if she had to. Capital gains. A general investment account? Exactly, yes. Okay. All right. Which, again, I just think that she shouldn't have to go into assets to make up for the monthly deficit, to pay for legal fees, to pay for other expenses, the taxes on her maintenance. And I think that a reasonable request, as I mentioned to Your Honor, was at that time in 2019 and 2020, it's just a few extra years and a review. And then, again, like I said, once those pensions kick in, I mean, candidly, there's no need for the maintenance at that point. Counsel argues that by her own choice she is living at an elevated standard of living compared to what she was living under during the marriage. I think that's argument that is not supported by the evidence at the hearing. I really believe that. Thank you very much. Justice Kennedy, anything else? All right. Thank you, gentlemen. We will take this matter under advisement. A decision will be rendered in due course. We're going to stand in recess at this time to prepare for our next hearing. Thank you.